[No. 77281-9. En Banc.]
Argued October 19, 2006. Decided June 14, 2007.

THE STATE OF WASHINGTON, *Respondent*, v. KENDRA LYNN WATT, *Petitioner*.

*Douglas D. Phelps* (of *Phelps & Associates*), for petitioner.

*Andrew K. Miller, Prosecuting Attorney*, and *Terry J. Bloor, Deputy*, for respondent.

¶1 MADSEN, J. — Kendra L. Watt challenges the Court of Appeals ruling affirming her conviction for manufacture of methamphetamine, possession of methamphetamine, and second degree criminal mistreatment. On direct appeal, the Court of Appeals affirmed the convictions, and this court denied review, but the United States Supreme Court vacated the judgment and remanded for reconsideration in light of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).[1] On remand, the Court of Appeals again affirmed, holding that the admission of hearsay statements violated Watt's constitutional right to confrontation, but that the error was harmless. Watt argues that post-*Crawford*, such violations are not subject to harmless error analysis and, alternatively, that the error in this case was not harmless. We disagree and affirm the Court of Appeals.

---

[1] The United States Supreme Court issued *Crawford* on March 8, 2004, approximately one month before this court denied Watt's first petition for discretionary review.

## FACTS

¶2 Based on an informant's tip about a methamphetamine lab, police obtained a warrant to search the property of Kendra and James Watt. On the strength of evidence obtained during execution of the warrant, both Kendra and James were charged with manufacture of methamphetamine with notice of a child present,[2] possession of methamphetamine,[3] and second degree criminal mistreatment.[4] The criminal mistreatment charge alleged that the Watts recklessly endangered three children in their custody, R.J., M.J., and K.W., by exposing them to the hazards of a methamphetamine lab. James pleaded guilty to manufacture of methamphetamine and second degree criminal mistreatment but Kendra went to trial.

¶3 At trial, Kendra stated that she would invoke the marital privilege to preclude James from testifying. Over her objection, the trial court admitted two of James's hearsay statements: (1) his redacted guilty plea, including the handwritten statement, "I admit to making a small amount of meth.[5] I did so in a detached garage on the premises. The children lived on the premises but were not present when I made the drugs," and (2) his statement to a police investigator that he made his own anhydrous ammonia. Ex. 83.

¶4 The jury convicted Kendra and the Court of Appeals affirmed in an unpublished opinion. *State v. Watt*, noted at 117 Wn. App. 1089, 2003 Wash. App. LEXIS 1725. This court denied review. *State v. Watt*, 151 Wn.2d 1013, 88 P.3d 965 (2004). The United States Supreme Court vacated the judgment and remanded for further consideration in light of *Crawford*. *Watt v. Washington*, 543 U.S. 976, 125 S. Ct.

---

[2] Former RCW 69.50.401(a)(1) (2002).

[3] Former RCW 69.50.401(d) (2002).

[4] RCW 9A.42.030(1)(a).

[5] The following phrase was blacked out: "for my wife who was spending money on purchasing drugs on her own." Verbatim Report of Proceedings at 93.

477, 160 L. Ed. 2d 354 (2004). On remand, the Court of Appeals again affirmed, holding that the admission of James's out-of-court statements violated Kendra's constitutional right of confrontation but that the error was harmless. *State v. Watt*, noted at 127 Wn. App. 1042, 2005 Wash. App. LEXIS 1178. Kendra subsequently petitioned for review in this court.

## ANALYSIS

¶5 The confrontation clause of the Sixth Amendment reads, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Prior to *Crawford*, an unavailable witness's hearsay statement was deemed admissible under the confrontation clause if the statement bore adequate "indicia of reliability" as determined by the trial court judge. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *overruled by Crawford*, 541 U.S. 36. In *Crawford* the Supreme Court held that "adequate indicia of reliability" is not a constitutionally adequate proxy for cross-examination. *Crawford*, 541 U.S. at 42. Rather, the confrontation clause requires that the reliability of testimonial evidence be tested in a particular manner, i.e., through cross-examination by the defendant. *Id.* at 61. Thus, a hearsay statement that is "testimonial" is inadmissible unless the defendant has an opportunity to cross-examine the witness either before or at trial. *Id.* at 68.

¶6 Here, it is undisputed that the admission of James's hearsay statements violated the confrontation clause under the rule announced in *Crawford*. Both statements fall within the "core class" of testimonial statements. *Id.* at 51. James was unavailable to testify and Kendra had no prior opportunity to cross-examine him. The only question is whether the error requires reversal.

¶7 Kendra contends that under *Crawford*, a violation of the right of confrontation requires automatic reversal. She argues that *Crawford* established a "watershed rule of criminal procedure," the violation of which requires auto-

matic reversal. In support, she relies on *Bockting v. Bayer*, 399 F.3d 1010, 408 F.3d 1127 (9th Cir. 2005), *rev'd sub nom. Whorton v. Bockting*, 549 U.S. 406, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007),[6] in which the Ninth Circuit Court of Appeals held that *Crawford* applies retroactively because it is a new "bedrock rule[ ] of criminal procedure," the absence of which seriously diminishes the reliability of a criminal conviction. *Bockting*, 399 F.3d at 1016.

¶8 Kendra's argument is not well taken. Even before the United States Supreme Court reversed *Bockting*, this court expressly declined to follow it in *In re Personal Restraint of Markel*, 154 Wn.2d 262, 111 P.3d 249 (2005), joining the overwhelming majority of courts that had concluded *Crawford* did not announce a watershed rule of criminal procedure. In *Markel*, this court reasoned that the accuracy of a conviction is not seriously diminished in the absence of the *Crawford* rule because a defendant could challenge the use of hearsay evidence within the previously recognized contours of the confrontation clause. *Id.* at 273, ¶ 18. In reversing *Bockting*, the Supreme Court similarly reasoned that any incremental improvement in the reliability of testimonial evidence resulting from the *Crawford* rule is not of such "magnitude" as to cast doubt on the accuracy of convictions obtained under the *Roberts* rule. *Whorton*, 127 S. Ct. at 1183.

¶9 Although the Supreme Court recently held that *Crawford* does not apply retroactively, whether a violation of the right of confrontation requires automatic reversal presents a distinct issue. Retroactivity depends on whether a new rule of constitutional law affects the reliability of the proceedings. *Teague v. Lane*, 489 U.S. 288, 313, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). In contrast, whether a constitutional error requires automatic reversal depends on whether its effect on the trial can be assessed. These are

---

[6] The United States Supreme Court heard argument on *Bockting* on November 1, 2006.

different issues that require separate analysis.[7] *Tyler v. Cain*, 533 U.S. 656, 666, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001) ("The standard for determining whether an error [requires automatic reversal] is not coextensive" with a determination that the error involves a watershed rule of criminal procedure. (citation omitted)). A constitutional error may require automatic reversal even though it does not apply retroactively. *Id.* at 656 (defective reasonable doubt instruction, although structural error, does not apply retroactively).

¶10 Automatic reversal is required only when a constitutional error can be characterized as a "structural defect." "Structural defects" defy harmless error analysis because they undermine the framework of the trial process itself, their effect cannot be ascertained without resort to speculation, or the question of harmlessness is irrelevant based on the nature of the right involved. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 2563, 165 L. Ed. 2d 409 (2006) (denial of right to counsel of choice); *see, e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable doubt instruction); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (denial of the right to self-representation); *Waller v. Georgia*, 467 U.S. 39, 49 n.9, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (denial of right to public trial); *Pate v. Robinson*, 383 U.S. 375, 387, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966) (discrimination in the selection of a jury); *White v. Maryland*, 373 U.S. 59, 60, 83 S. Ct. 1050, 10 L. Ed. 2d 193 (1963) (failure to determine that a defendant is competent to stand trial); *Gideon v. Wain-*

---

[7] The other cases Kendra cites in support of her argument that *Crawford* requires automatic reversal also involve retroactivity, not the applicability of harmless error analysis, and thus are inapposite. *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004) (new rule that juries, not judges, must find aggravating factors that enhance a sentence does not apply retroactively because it is not a watershed rule); *Sawyer v. Smith*, 497 U.S. 227, 241-42, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990) (new rule that prosecutor may not inform jury a death penalty recommendation is merely advisory does not apply retroactively because it is not a watershed rule); *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) (a new constitutional rule applies to all cases pending on direct review).

*wright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (denial of the right to appointed counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (denial of the right to an unbiased adjudicator).

¶11 Many claimed constitutional errors occur during the presentation of the case to the jury. Generally, these "trial errors" are reviewable because their effect may be evaluated in the context of the other evidence presented to determine whether the error was harmless beyond a reasonable doubt. *See, e.g., Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006) (judicial fact-finding in violation of Sixth Amendment right to jury trial is a trial error) (citing *Arizona v. Fulminante*, 499 U.S. 279, 306-07, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (cataloguing trial errors subject to harmless error review)).

¶12 The admission of a hearsay statement in violation of the confrontation clause is a classic trial error. This is so because a reviewing court may evaluate the possible effect of the hearsay statement in the context of all the evidence presented at trial. *See State v. Guloy*, 104 Wn.2d 412, 432, 705 P.2d 1182 (1985) (Brachtenbach, J., concurring). Indeed, it is well established under federal and state law that a violation of the confrontation clause is subject to harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ("The constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to . . . harmless-error analysis."); *State v. Smith*, 148 Wn.2d 122, 138-39, 59 P.3d 74 (2002) ("constitutional error that violates a defendant's rights under the confrontation clause may be so inconsequential that it is rendered harmless"); *State v. Hieb*, 107 Wn.2d 97, 109, 727 P.2d 239 (1986) ("We take this opportunity to reaffirm our decision that a violation of the confrontation clause by the admission of hearsay evidence may constitute harmless error."); *Guloy*, 104 Wn.2d at 425 ("violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless").

¶13 In *State v. Davis*, 154 Wn.2d 291, 305, ¶ 38, 111 P.3d 844 (2005), *aff'd*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), decided after *Crawford*, this court engaged in a harmless error analysis to determine whether the admission of testimonial statements to a 911 operator in violation of the right of confrontation required reversal of the conviction.[8] On review, the United States Supreme Court addressed only whether this court correctly classified certain statements as nontestimonial, not the propriety of the harmless error analysis, "assum[ing] it to be correct" because the petitioner did not seek review of the issue. *Davis*, 547 U.S. at 829.

¶14 Although the United States Supreme Court has not expressly held that confrontation violations may be harmless, those justices who disagreed with the Court's pre-*Crawford* refusal to depart from *Roberts* in *Lilly v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), nonetheless concurred in the judgment, agreeing that the case should be remanded for a harmless error analysis. *Id.* at 143 (Scalia, J., concurring in part, concurring in the judgment) (stating that admission of accomplice's statement against defendant violated the confrontation clause but that case should be remanded for harmless error review); *id.* at 144 (Rehnquist, C.J., concurring in the judgment, joined by O'Connor and Kennedy, JJ.); *see also id.* at 143 (Thomas, J., concurring in part, concurring in the judgment) (joining plurality in remanding case for harmless error review).

¶15 Post-*Crawford*, all of the federal circuit courts have applied harmless error analysis to confrontation violations without distinguishing whether the confrontation violations occurred pre- or post-*Crawford*. *See, e.g., United States v. Rodriguez-Marrero*, 390 F.3d 1, 18 (1st Cir. 2004); *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004); *United States v. Hinton*, 423 F.3d 355, 362 (3d Cir. 2005);

---

[8] Whether a *Crawford* error is a structural defect requiring automatic reversal was not at issue in *Davis*.

*United States v. Khan*, 461 F.3d 477 (4th Cir. 2006); *Guidry v. Dretke*, 397 F.3d 306, 331 (5th Cir. 2005); *United States v. Savoires*, 430 F.3d 376, 382 (6th Cir. 2005); *United States v. Gilbert*, 391 F.3d 882, 884 (7th Cir. 2004); *Middleton v. Roper*, 455 F.3d 838, 857 (8th Cir. 2006); *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *United States v. Summers*, 414 F.3d 1287, 1303 (10th Cir. 2005).

¶16 We, too, see nothing in the *Crawford* analysis to suggest that a confrontation violation is no longer amenable to harmless error analysis. The impact of an improperly admitted hearsay statement is the same, whether it is inadmissible because it lacked adequate indicia of reliability or because it was not subject to cross-examination. In either event, a hearsay statement is a discrete piece of evidence that may be assessed in the context of other evidence presented at trial to determine whether it was harmless beyond a reasonable doubt. Accordingly, we hold that confrontation violations, even after *Crawford*, are subject to a harmless error analysis.

¶17 Next, we address Kendra's contention that even if a confrontation violation is subject to harmless error analysis post-*Crawford*, the error in this case is not harmless. As this court observed in *Guloy*, 104 Wn.2d at 425, constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless. A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *Id.* However, a constitutional error does not require reversal when it is clear beyond a reasonable doubt that the jury verdict is unattributable to the error. *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

¶18 In *Guloy*, 104 Wn.2d at 426, this court adopted the " 'overwhelming untainted evidence' " test because that test "allows the appellate court to avoid reversal on merely

technical or academic grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." Under this test, the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. In *Guloy*, two cannery workers, Viernes and Domingo, were killed in order to advance a gambling conspiracy. *Id*. at 414-15. The evidence showed that Dictado was the leader of the gang and that Dictado wanted to send two members of the gang to Alaska in order to gain control of gambling in that state. *Id*. at 415. During the trial, witness San Pablo was permitted to testify to two out-of-court statements made by Dictado that he was going to kill Viernes. *Id*. at 425. On review, the court held that the admission of these statements violated the confrontation clause. *Id*. However, focusing on the untainted evidence that the two defendants were observed leaving the scene of the murder and Domingo's dying declaration that the defendants had attacked him, the court held that exclusion of the statements would not have resulted in a different verdict and therefore the error was harmless. *Id*. at 422-23.

¶19 Kendra argues here that admission of James's statements was not harmless. Focusing on the impact of the tainted evidence, she contends that James's statement that he made anhydrous ammonia was critical to the State's case because anhydrous ammonia is an essential ingredient to the manufacture of methamphetamine yet was absent from the premises. She further argues that his admission to making methamphetamine while children lived on the property was critical because it (1) precluded her from contesting the existence of a methamphetamine lab and (2) was necessary to prove that children lived on the premises. However, the overwhelming untainted evidence test focuses on the *untainted* evidence. Thus, applying that test requires us to review the evidence that was properly admitted at trial.

¶20 The untainted evidence here satisfies this court's harmless error test. The evidence shows that police became interested in the Watts after receiving an informant's tip about a methamphetamine lab operating in the Watts' garage. Based on the tip, police obtained a search warrant for the Watts' home as well as the garage. When police searched the master bedroom in the Watts' house, they found two plastic baggies containing a small amount of methamphetamine in a wallet that held Kendra's identification, a set of scales of the kind typically used to measure drugs, receipts for numerous items associated with the manufacture of methamphetamine, and several plastic baggies of methamphetamine inside a fire safe. In addition, a video surveillance system had been installed in the master bedroom, allowing the Watts to monitor activities in the front yard.

¶21 Inside the detached garage, the police discovered extensive evidence of a methamphetamine lab. Upon entering the garage, the police detected a strong chemical odor characteristic of methamphetamine labs. An interior room within the garage contained all the essential components of a methamphetamine lab except for anhydrous ammonia, including xylene, toluene, muriatic acid, dry ice, acetone, denatured alcohol, mineral spirits, lithium batteries, Red Devil lye, Coleman fuel, rock salt, numerous canning jars with white residue, a coffee grinder, coffee filters, a set of scales, funnels, and various utensils. Although there was no anhydrous ammonia on the premises, all the ingredients necessary to produce that substance were on site, including several bags of fertilizer. The garage was outfitted with an extensive ventilation system. The ventilation piping was lined with methamphetamine residue. Several partially filled containers held the chemical byproducts of the methamphetamine manufacturing process. Four coffee filters contained finished methamphetamine.

¶22 The informant who supplied the initial tip to the police, Robert Savage, testified that he saw James "cooking methamphetamine" in the garage on two occasions. On the

first occasion, Kendra was present, together with the Watts' 14-year-old niece, who assisted James by cleaning Mason jars and utensils. Savage testified that, in his opinion, it was obvious to all present that James was preparing methamphetamine. Savage also testified that during the second visit to the garage, James told Savage that he needed toluene to finish the batch of methamphetamine. When Savage later offered to help him get some toluene, James said he had already obtained it.

¶23 At approximately the same time that James told Savage that he no longer needed toluene, a paint store employee testified that Kendra had purchased a five gallon can of toluene. According to the witness, Kendra said she needed the toluene to remove adhesive from tiles. The witness also testified that professional painters use about a gallon or two of toluene every six months.

¶24 K.W., James's 13-year-old daughter and Kendra's stepdaughter, also testified. She stated that she lived at the residence together with R.J., age 13, and M.J., age 6. She said that James and Kendra spent much of their time in the master bedroom. Once she entered the bedroom and saw Kendra pushing some white powder around on a mirror. She testified that Kendra picked at her body and sometimes said there were worms under her skin that she wanted to pull out.[9] K.W. also said that Kendra had a key to the garage and sometimes went into the garage.

¶25 Kendra's defense was that she was unaware that James manufactured methamphetamine in the detached garage and that she did not participate. She relied on evidence of marital discord to support her defense. Specifically, she elicited testimony from Savage that James secretly tape recorded Kendra's phone calls and became enraged when Kendra retrieved one of the tape recordings from the garage. Savage also stated that James sometimes became violent during arguments with Kendra and that

---

[9] According to another witness, this behavior is typical of people who use methamphetamine.

Kendra was visibly afraid of him. Kendra also elicited testimony from a police officer who had visited the residence several times in response to reports of domestic violence.

¶26 In addition, Kendra presented several defense witnesses who testified that James prohibited her and the children from entering the garage; that the witnesses never noticed noxious fumes on the premises; that Kendra was ill with fibromyalgia, received regular medical treatment for the illness, and was often bedridden; that she used the scales in her bedroom to measure out various herbal remedies; and that she relied on the television monitor to watch her children while they were playing in the front yard because she was suspicious of the men who lived across the street.

¶27 Finally, Kendra offered evidence to impeach Savage's credibility by showing that he did not inform the police that he was a current user of methamphetamine; that his stated motive for calling in the tip changed over time; that he did not initially tell the police that Kendra was present while James manufactured methamphetamine; that two days after the Watts were arrested he removed items from the garage; and that he wanted to purchase some property that the Watts intended to buy.

¶28 Evidence controverting the State's case and presenting a viable defense theory suggests that an error is not harmless. *State v. Damon*, 144 Wn.2d 686, 695, 25 P.3d 418, 33 P.3d 735 (2001). However, the question is not whether the defendant has presented a viable defense theory in general, but whether the facts to be proved by the testimonial evidence are reasonably subject to dispute. As in the case of an omitted or misstated essential element in a jury instruction, where this court has held that an error is harmless when uncontroverted evidence proves the omitted or misstated element, the wrongful admission of a hearsay statement will generally permit a similarly focused inquiry. *State v. Brown*, 147 Wn.2d 330, 340, 58 P.3d 889 (2002) (adopting the *Neder* test).

¶29 Here, even without James's statements, overwhelming untainted evidence establishes that methamphetamine was manufactured in the garage and Kendra did not contest that fact. Moreover, the admission of James's redacted guilty plea did nothing to undermine her defense theory and, in fact, may have aided it by establishing that he took responsibility for the methamphetamine lab himself without implicating her.

¶30 Overwhelming untainted evidence also establishes that children resided on the premises where the methamphetamine was manufactured. Contrary to Kendra's assertion, James's guilty plea did not supply the only evidence that children were present at the residence. One of the children testified at trial, stating that she and her two younger sisters lived at the residence. When police executed the warrant, one of the children was present, children's toys were in the front yard, and testimony by Kendra's own witnesses established the presence of children at the residence. Her mother testified that when she babysat for the Watts, James instructed her to keep the children away from the garage. Her sister and mother stated that Kendra used the video monitor to keep an eye on the children while they played in the yard. In sum, there was no evidence controverting the fact that children lived on the premises.

¶31 Because overwhelming untainted evidence establishes the facts that the State sought to prove with James's hearsay statements, the admission of that evidence was harmless beyond a reasonable doubt. The erroneously admitted evidence in this case has no bearing on disputed factual issues before the jury. *See State v. Levy*, 156 Wn.2d 709, 727, ¶ 36, 132 P.3d 1076 (2006) (judicial comment unrelated to issue in controversy held harmless); Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 GONZ. L. REV. 277, 303-04 (1995-96) (erroneous admission of evidence unrelated to an issue in controversy is harmless). A retrial of this case would focus again not on whether methamphetamine was manufac-

tured on the property or whether children lived there, but on whether Kendra knew about the methamphetamine lab and participated in it.[10] Thus, we hold that the admission of the statements, though error, was harmless and affirm the Court of Appeals.

ALEXANDER, C.J., and C. JOHNSON, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

¶32 SANDERS, J. (concurring) — The majority holds the trial court violated Kendra Watt's Sixth Amendment right of confrontation by improperly admitting redacted portions of her husband's guilty plea. But it ultimately claims this error is harmless because of the "overwhelming untainted evidence." Majority at 640. I concur in the result but write separately to note the error was harmless only because it did not relate to a disputed issue. The improper evidence established only that James Watt, Kendra's husband, admitted to manufacturing methamphetamine and was not relevant to Kendra's defense that she was unaware of her husband's activities.

¶33 While the majority briefly notes that an unrelated issue has no bearing on the issue before the jury, majority at 640, it erroneously focuses on the other evidence that suggested Kendra manufactured and possessed methamphetamine. Error is harmless only when it does not involve relevant evidence properly presented to the jury. "[I]t is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors." *State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946). Indeed, we may excuse as harmless error only an "error which is trivial, or formal, or merely academic, and was not preju-

---

[10] The State filed a motion to supplement the record with a copy of the Watts' dissolution decree dated June 26, 2006, more than four years after the trial. RAP 9.11. The State contends that since James is no longer unavailable to testify at trial, he could now testify at trial, and a new trial is unnecessary because the State's case will be even stronger than it was at the first trial. We deny the motion to supplement the record because the fact that the State could present James's testimony at a retrial does not aid this court's determination of whether admission of his statements at the first trial was harmless.

dicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case." *State v. Britton*, 27 Wn.2d 336, 341, 178 P.2d 341 (1947). The assumption a court "can determine what evidence or instruction influenced the jury's decision" is "a tacit admission that an appellate court is necessarily engaging in fact-finding." Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 Gonz. L. Rev. 277, 279 (1995-96). And we "have no right to trench upon the province of the jury upon questions of fact." *Jensen v. Shaw Show Case Co.*, 76 Wash. 419, 421, 136 P. 698 (1913); *see* Wash. Const. art. I, § 21 ("right of trial by jury shall remain inviolate"); U.S. Const. amend. VI (guaranteeing trial by jury).

¶34 Therefore, the error was harmless because, even though evidence was admitted in error, it was unrelated to the issue in controversy. Majority at 640. "[I]f the disputed evidence or instruction does not relate to a disputed issue, it is likely to be harmless. This factor is based on the rational assumption that such [evidence] should not have influenced jury deliberations." Sweeney, *supra*, at 304. Kendra's defense was she was unaware any methamphetamine was being manufactured in the garage. She argued to the jury that her husband kept her out of the garage, she was often sick and in bed, and she had no knowledge of her husband's activities. The improperly admitted statements only confirmed her husband made methamphetamine in the garage. Clearly, the jury did not believe Kendra was unaware of what was happening in her garage. But if James Watt's improperly admitted statements had controverted Kendra's defense or involved relevant evidence properly before the jury, the error could not have been harmless.

¶35 I concur.

¶36 J.M. Johnson, J. (concurring) — I agree that under our traditional harmless error analysis, the admission of Kendra Watt's ex-husband's statements constitutes harmless error. However, that such obviously influential evi-

dence as a spouse's confession to illegal activities within the marital home may be deemed harmless causes me to question the soundness of our present approach to harmless error. Perhaps, at some future point, it would behoove this court to consider changing, or at least supplementing, our harmless error analysis. *See, e.g.,* Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process,* 31 GONZ. L. REV. 277 (1995-96). With these observations, I concur.